Let me, as a first order of business, on behalf of myself and Judge Grant, I'd like to welcome Judge Calvert, who is sitting with us on two days this week. She is a judge for the U.S. District Court for the Northern District of Georgia, and she's sitting with us by designation. Today we are going to be hearing three cases, and just in case there's someone here who's not familiar with our traffic light system for oral argument, you will see the red, yellow, and green lights on the podium, and so when you start your oral argument, it will be green. You will get the yellow light at the two-minute warning, so that is a sign that you're running out of time, and when it hits red, I will ask you to complete your thought, but then I will have you stop talking at that point. Let me call the first case, United States of America v. William Bryan, Gregory McMichael, and Travis McMichael, 22-12792. Ms. Copeland, it looks like you are going to speak for four minutes, and you've saved a minute for rebuttal. Yes, Your Honor. Thank you. Please proceed. Good morning, and may it please the Court. My name is Ann Marie Copeland, and I'm C.J. A. Counsel for Travis McMichael. Today, I'm going to be talking about the provided or administered requirement of Section 245. My colleague, Mr. Balbo, will be discussing the because of requirement of the same statute, and Mr. Theodosian will be speaking about the kidnapping statute. When in an attempt to charge my client with a violation of rights statute, interference with rights, the government had to prove that the neighborhood streets of Satilla Shore Subdivision were provided or administered by Glen County, Georgia. It didn't either as a matter of law. The county simply did not provide these subdivision streets. The developer did in 1958. When the developer did, he offered to dedicate them to the county, but the county expressly refused that offer of dedication. The legal effect of the refused offer of dedication, coupled with what the county actually did in the intervening years, shows that the county simply did not administer the streets. The district court found that it was enough that the streets were simply usable, but that's not the case, Your Honor. What has to be done for a county to impliedly accept an offer of dedication is to show an exercise of dominion and control over those streets. In my brief, I break it down in some detail about what the county did. For instance, they presented 101 service tickets, 79 of which occurred before Mr. Arberry's death, which showed that the county tended to things like mosquitoes. They tended to drainage. They tended to ditches. They did trash pickup. The only time that they- Why doesn't drainage relate to the roads? Would the roads be safe and usable if no one was concerned with drainage issues? Your Honor, the drainage is part of the right of way in this particular street. The Department of Public Works expert, Mr. Bison, he was the manager over the roads, testified that that was simply part of the right of way. The indictment here simply charged streets, and the streets themselves were what the county was charging. Do you have any case law that says we need to draw the distinction between streets and right of way? Your Honor, I don't, except that they're simply different. What did the indictment give the defendant's notice of? It was the streets, and that was not what the government proved in this case. Well, but in the opposing counsel's brief, I know you have sort of parsed out this plethora of tickets, of repair tickets from the county, but we've got a list of things. The county official who oversees the public streets in Glynn County testified that the streets in Statilla Shores are officially designated as public streets. We have all of these tickets. I understand you've grouped them into categories, but there are a lot of work tickets that exist for the streets, and we know that Glynn County does not fulfill a request for service on private roads. Why is that not enough? It is not enough for several reasons. Number one, the fact that it was on a list of county roads does not show acceptance of express or implied by the county commission. This was a totally different entity than the county commission. Number two, what the county did, again, just went to drainage, they went to mosquitoes, they went to elevation. When you look at these roads, and you can see them in the drone footage in Exhibit 1, they are simply a road, and then it falls off into people's yards, basically. The ditches are sort of down beside. When you look at the drainage repairs that the county did, it's things like both cleaning out the dishes, but fixing sinkholes in the property owner's yard. It had nothing to do with the streets. The only time that the county affected a repair of asphalt in Statilla Shores subdivision was incident to a drainage project. When you look at what they actually did with the roads, there were just two service tickets that related to it. One, a resident called for a street sweeper, and number two, a resident called Public Works and said, can you get the garbage company to clean up this hydraulic spill that they left on our street? Is this a factual question or a legal question? Your Honor, I'm almost out of time. May I answer your question? Yes, please. Thank you. It is a legal issue because it had a legal effect. When you look at how state law handles these offers of dedication case, 9620, I think, is the provision about this. It is by mandamus. It is if there are no disputed facts, the judge handles them himself at a hearing. I had no opportunity to raise this by summary judgment with the district court, and there was no way I was filing a trial brief on this particular issue, Judge, because I didn't want to tell my opponent how to try its case. That's not my job. Thank you. Thank you. Mr. Balbo, you have four minutes as well, and you've saved a minute for rebuttal. May it please the court. My name is A.J. Balbo, and I represent the appellant, Greg McMichael. I'm going to focus on issue two of our brief, and that is that the government failed to present sufficient evidence at trial with which a reasonable jury could have concluded that Greg McMichael acted against Mr. Arbery because of Mr. Arbery's use of a public facility or benefit. As the court is aware, in order for the government to sustain a conviction under 245B, they need to show two things. First, that a defendant acted because of another's race, and two, that a defendant acted because of another's use of a public benefit. We maintain that the government failed on both prongs, but it is the second prong that I think that weakness is more glaring. When we talk about because in a statute like this, we are talking about but-for causation, and we look to the Supreme Court cases of Burge versus the United States versus Feldman for an explanation of but-for. We agree with the government that the causation does not have to be the sole cause that an event takes place, but it has to be determinative, meaning it's the proverbial straw that broke the camel's back. So are you saying that a defendant could make a, if a person is a defendant who's going to make a race-based attack on someone in a variety of situations, then you can't prove that the fact that they also made the race-based attack because the person was on the street, then they can't be guilty of that crime? Your Honor, there's different ways that 245 tries to govern conduct, and we agree with the government that the purpose behind the statute is to punish or deter those who would forcibly try to suppress another from exercising a public benefit. So it's more than just simply jurisdictional. It's an essential element. I think the facts here overwhelmingly show that if Greg McMichael saw Ahmaud Arbery inside the house that was under construction and not on a street, he would have gone up to him. He would have initiated... Right. So he would have made, if you believe the evidence that the jury accepted, he would have made, which seems pretty overwhelming to me, he would have made an attack on Mr. Arbery because he was black, because he was in an abandoned house, or because he was black, because he was on a street, or because he was black in any number of other situations. I don't think that means that he didn't make one of those attacks because he was on the street. The fact that he would make a broad variety of attacks doesn't mean that each reason can't count for something. Yes, Your Honor, but the statute does not punish somebody simply for being racist or making a racist attack. It is to allow people to exercise federally protected rights, to give teeth to the Civil Rights Act. That's the purpose of the statute. So it is a necessary element that this take place, in this case, on a public street. So the jury could have concluded that the use of the streets was happenstance, but the jury did not. Your Honor, I believe that it has to be more than just simply happenstance. The statute could have been written in a way to show that it... No, but your theory is happenstance, that he would have, if he'd been running through the neighbor's yards, this was just happenstance. It was on a public street. That was your theory. The jury could have accepted it. The jury didn't. And you can't overturn that verdict if any reasonable construction would have allowed the jury to find your client guilty beyond a reasonable doubt. That is correct. And this court does have to view it in a light most favorable to the jury's verdict. However, this court still has to make sure that the government has met its burden, that there was sufficient evidence put forward, that a reasonable jury could have come to that conclusion. In this case, the overwhelming evidence is that Greg McMichael saw the person he saw on that video footage, judged that person by his height, his weight, his tattoos, his manner of dress. If this person had been a 60-year-old black man, Greg McMichael would not have engaged him. The race was a non-contributing role in this matter. But also evidence was put forth that when there was a suspected criminal who happened to be white, there was the use of the non-emergency line. It wasn't like, let's get in our trucks and chase that person down the street. Your Honor, I see my time is of the experiment, if I may answer. Please, yes. In that particular case, that 911 call that was made was made after Greg McMichael actually engaged that white person under a bridge. So there was an engagement. It wasn't simply that he saw the person from afar and made a phone call. He engaged the person. And yes, does this display a hyper-vigilantism? Yes. Is that praiseworthy? Is that something to be encouraged? No. But the fact is, at the end of the day, this issue isn't about the racism of these defendants. It's about whether or not the government met its burden. Thank you. You've reserved a minute for rebuttal. Mr. Theodosian, you also have four minutes with one minute for rebuttal. Thank you very much. Good morning. My name is Pete Theodosian. I represent William Roddy Bryan. I want to focus on part three of my brief, which deals with the attempted kidnapping, 18 U.S.C. 1201, specifically the benefits clause. Of course, the government had to prove that the defendants attempted to confine Mr. Arbery against his will and hold him for a benefit. Now, the benefits clause is self-explanatory. The benefit doesn't have to be money. It's you can hold someone for a reward, a ransom, or any personal benefit. But you have to be acting out of a want of a personal benefit. Now, the cases that are cited are far different than this case. The cases in the government's brief, you know, the Gooch case, which basically sort of defined what that meant, defendants seized officers to avoid being arrested. They seized the confined officers, released them after they crossed state line. The benefit they were receiving was their personal freedom. Again, not money, certainly something of value. To them, the 11th Circuit cases that are cited by the government, Lewis and Myers, the government suggests that those two cases highlight the, quote, sweeping coverage of the benefits clause. Again, far different than here. In the Lewis case... Well, Lewis, Lewis was about, you know, the defendant had admitted it was for companionship that he had kidnapped the person. I mean, that seems pretty broad of a benefit. Yes, ma'am. It's important to note the Lewis case was actually a guilty plea. It was a sentencing judge. You know, were you receiving a benefit? He said yes. Asked specifically what was that benefit. He said, well, I guess companionship. He had raped the victim during the kidnapping. The identical situation almost in the Myers case, the other 11th Circuit case. Again, the victim was raped during the confinement. And so in both those cases, even though they're presented for the proposition that it could be something sort of, you know, out there like companionship or affection, those were very specific benefits that the defendants had in their relations with their victims. Again, far different than here. The probably one case that's cited that has some sort of resemblance to this was the United States v. Parker, which dealt with the investigator who was trying to solve a case for his personal reputation. Again, that's very different. You know, that was a case... How is that different? How is this not, whether it's vigilantism or, you know, you want to be the neighborhood hero, how is that different? It's different because that was a challenge to, the defendants had filed a demur to the indictment, which was denied by the trial court. So they were challenging that rule and the indictment had specifically indicated that that was going to be the benefit sought. And of course, the government would have had the right to prove that if there's any specific evidence of that. That was not a situation as we had here where it was just a speculative benefit. But the jury was allowed to consider whether there was a benefit. And you've talked about different modes of proof for a few of these cases, but you've not talked about, I think, a more narrow conceptual framing for potential benefits, right? The benefit here, I think the government alleged, was vigilantism. The jury apparently decided that that, among other things, was the case. So why can we disturb that finding by the jury? I would argue that that expansive usage of the benefits clause would render it useless. There's a difference between acting for your own personal benefit and acting... The government and the rest of the case has said, well, the reason these men acted as they did, they thought the young man was a criminal. And part of that was race-based. They were trying to go after someone who they thought had committed a crime. That's doing something for the community, not yourself, right? They weren't going to get anything out of it unless you just used rank speculation. Except they're a part of the community. I guess I'm not sure why a benefit that extends to the community doesn't also pick up them when they're members of the community. Again, my time's running out. Could I answer, Your Honor? I think that would render this clause completely useless. When you think about the biggest sacrifice a person could make, you could always just speculate, well, they wanted to feel good about themselves. The young men that stormed the beach in Normandy going to sure death, you know, the government under this theory would say, well, you know, they wanted to do it for their country. Everything is a benefit. So once you blend in a reason for doing something and a benefit, then really this clause is unnecessary. So what I would ask, and I'm going to sit down, what I would ask for the government to give us an example of a confinement that would not qualify under this statute, that you couldn't argue was a benefit. And I'm not sure there is one if you're going to give it the expansive interpretation that they suggest. Thank you. Mr. Levine. Good morning, and may it please the court. My name is Brant Levine, and I represent the United States. I'd like to begin by focusing on what this case is really about, that Ahmaud Arbery would be alive today had he not been a black man running on the streets of Sotelo Shores. The hate-fueled violence that defendants inflicted on Ahmaud is precisely the type of conduct that Congress targeted when it passed the Civil Rights Act of 1968 and enacted Section 245. Nobody should have to fear that if they go for a run on a public street, they might end up running for their lives, being chased because of the color of their skin. That's why the defendants were charged with federal hate crimes. Now in all the guilty verdicts here on the hate crimes charges, they fail for two primary reasons. First, they fail under the standard of review. As the district court detailed in denying the defendant's motion to acquit, this is not a close case. There is sufficient evidence to support each and every guilty verdict. And second, the defendant's challenges fail under but-for causation. Now there doesn't appear to be any dispute that Ahmaud's race and Ahmaud's use of the streets need not be the defendant's sole motive or even a primary motive. But what I'd like to push back on is the premise of some of these arguments that this all started when Greg or Roddy Bryan first saw Ahmaud. That's not when this case first started. That's not a federal crime if they want to go investigate somebody who looks suspicious in the neighborhood. And in fact, had the McMichaels driven up to Ahmaud and said, excuse me, can we talk to you about what you were doing in that house, we wouldn't be here today. We're here today because when they went up to Ahmaud, they pulled out their guns, they yelled at him to get on the ground, they threatened to blow his head off. And they chased him. And Roddy Bryan blocked his exit from the neighborhood so he couldn't leave until, in Greg McMichael's words, they trapped him like a rat. That is the context in which to evaluate the but-for race and but-for streets. Why did they take those extreme measures? Why did they terrorize Ahmaud for nearly five minutes? And on the evidence before the jury, there's more than sufficient evidence to sustain the convictions on that point based on the defendant's own conduct that day. There are no questions on the because-of-race or because-of-streets. I will turn to the Georgia property law arguments. The Georgia property law arguments, as a defense counsel said, they're focusing on the legal effect of the 1958 action by the Glynn County Commissioners. And I would certainly concede that if this case occurred in 1958, we would probably lose. But it didn't occur in 1958, it occurred in 1920. And the question is, who was maintaining the streets then? And even if you accept their argument under Georgia property law, all that gets you is that Glynn County did not have a legal duty to maintain the streets of Satilla Shores. Do we need to look to Georgia, to the state property law when interpreting this statute? State property law can be relevant. In this case, though, it doesn't answer the question because we have a sufficiency challenge. You had defendants move to dismiss the indictment or raised a legal challenge. This might be a different story. But here, it's a sufficiency challenge. And if you look at the jury's instructions, which they agreed to, it doesn't bring up this issue of Georgia law. The jury just had to decide based on the plain text of the statute, did Glynn County provide or administer those streets? And the director of the Glynn County Department of Public Works Road Division, who testified, said that maintaining public streets, not only has the county done that for decades, but maintaining the public streets involves a lot more than simply paving them. The drainage work, the works on rights-of-way, street cleaning, street lights, all these are part and parcel of maintaining public streets. What about opposing counsel has made the argument that these work tickets over the course of time are simply dealing with the right-of-way, not the public street? Some of them do deal with the right-of-way, but some actually do deal with the public street. They say, well, that's just incidental to the right-of-way. And again, that gets back to my point that it doesn't matter why the county fixed the street, even if it was only to do the right-of-way. What matters is they actually did it. And there is enough evidence for the jury to reasonably infer that they did. And the defense made these exact arguments to the jury and the jury rejected them. So at this point, the question is, could the jury have reasonably concluded that the county provided or administered those streets? And the answer is yes. There is more than enough evidence from those work records, from Glynn County Commission meetings, minutes dating back to the 80s, approving contracts to pave the roads in Satilla Shores. What about the Facebook post and the county list of public streets, which predated the date of the incident? If we take those out, is there still sufficient evidence? There is. I would say first with the list of county roads, they have not challenged the admissibility of that on appeal. They did argue to the jury that it shouldn't be given much weight, but that can be considered now. So that's why you don't need to consider the Facebook post here. So this court can just simply disregard that because we have unchallenged testimony on appeal from the director of the Glynn County Public Works Department and all these records, 100 pages of service tickets, minutes from Glynn County Commission meetings. So there's plenty of information that this court does not need to consider the Facebook post here. There are no other questions on the provided or maintain the streets with Georgia property law. I will turn to the kidnapping charges. On the benefits clause, the defense counsel asked if we have a case, what wouldn't qualify? And we don't, Your Honor, because I'm not aware of any case, and they don't cite one, where court has held that something is not a benefit. It is very sweeping, and there's good reason for that. If you look at the legislative history of the Kidnapping Act, in 1932, when it was enacted, it was held for ransom or reward. Two years later, Congress amended the statute because people were being kidnapped and the government couldn't charge them, and added or otherwise, ransom, reward, or otherwise. And we're not rendering the statute meaningless. The key word in that clause is held, held for ransom, reward, or otherwise. So the Supreme Court has interpreted that clause that that's what Congress was getting at here, illegally holding someone. Why somebody illegally holds someone doesn't make that much of a difference here. But that being said, it is the government's element. The government, it is an element of the crime. The government has to prove something, and the government did prove something here. They did prove that the defendants were interested in vigilantism and getting that satisfaction of catching a black man that they assumed to be a criminal on the streets of their neighborhood. And although the defendants didn't bring it up now, I will address briefly the Commerce Clause issues that they addressed in their brief. And on that point, I would say that this is simply a sufficiency challenge, that the defendants did not raise an as-applied or constitutional challenge. So that means all this Court need to decide in this particular case, did the crime. And here, there is no dispute that the defendants drove their car. Without their use of their car, the kidnapping offense could never have taken place. And as this Court stated, Embank and Ballinger, Congress may prohibit harmful uses of instrumentalities of interstate commerce. And that's what we have here. The Embank Court said, and Ballinger says, that's true even if the harm flows outside the flow of commerce, even if the harm is not addressed, that exact issue, the Sixth and Seventh Circuits recently have, the Sixth Circuit in Wyndham and the Seventh Circuit in Provo have held that interstate use of a car to commit a kidnapping satisfies both the statute and the Constitution. So in our Garcia cases, I know you're well aware, we declined to find that cars or expressed some hesitation over finding that cars are per se instrumentalities of interstate commerce. Do we need to do that here? We have a car, I think, that was at least manufactured out of state. So are we going to have to wrestle with that issue here? You don't need to wrestle with that issue here. And if I understand the concern correctly in Garcia, it wasn't so much are cars instrumentalities of interstate commerce because every court to decide that has held yes. I think what Garcia was concerned about are the effects of that. Does that mean that Congress can regulate anything and everything related to cars? And Garcia involved a regulatory scheme. It was a tort reform statute. So that's a concern here. Here we have a criminal case, kidnapping. So kidnapping is clearly a harmful use of an instrumentality of interstate commerce. This falls in the heartland of what Congress can regulate here. So Garcia would not need to apply here or stop this court from rejecting their sufficiency challenge. But doesn't that mean that every kidnapping could be a federal crime when we look at the facts that were present here? It could be a, every kidnapping could be a federal crime if a car was used in furtherance of that crime. And here they weren't driving on an interstate. They weren't trying to, we have no evidence that they were transporting Mr. Arbery somewhere, you know, outside of even the Satilla Shores neighborhood. I mean, isn't this kind of a bit of a stretch to say that this falls within the statute of a federal crime? It's not a stretch. And I want to pick up on what you said about the statute. You know, the statute, the jurisdictional hook of the kidnapping statute talks about an offender traveling in interstate commerce or using an instrumentality of interstate commerce. So those two words in versus of shows Congress's intent that for a car or an instrumentality of interstate commerce, it can be intrastate. It doesn't have to be interstate. And this is not going too far because instrumentalities of interstate commerce by their very nature can spread harm. The Supreme Court has said we don't have to wait for harm to spread between states because cars transport people between states that Congress can regulate them even if the harm occurs within a state. And this court has dealt with a similar issue in the Evans case with a cell phone, even though there was no evidence of a cell phone being connected to interstate commerce that this court held it didn't matter because it is an instrumentality of interstate commerce that is sufficient. So because there's an instrumentality of interstate commerce and here cars, as other courts have said, including in Protho and Wyndham, where the cars were driven also just intrastate, that is sufficient. If there are no other questions, we ask that you affirm the guilty verdicts. Thank you. Thank you. All right. I note that all three of you have one minute left for rebuttal. Be aware that goes very, very quickly. Judge Branch, you asked why do we look to state property law in this case? The Georgia Supreme Court in a December 2023 case says that the acceptance of an offer of dedication is how a county obligates itself to maintain a county road. In this case, the judge in the district court purported to say that administer means to manage and that provide means to supply and that those what those really mean are maintain. And so if you want to talk about whether a county has an obligation and a duty and has assumed that, you have to look at this particular offer of dedication. Despite the fact that... But you conceded in your opening remarks that that is not the beginning and end of the story. There are other factors. There is other undisputed evidence that's in this record. There are the service tickets, which don't show much work on the roads, if any, at all. Opposing counsel has just gotten up and pointed out that there are instances of paving of the roads and paving contracts that have been undertaken to pave those roads. To answer that very quickly, I think the strongest argument that my opponent would have at that respect is at the second page of the county commission minutes. That is an undated, unpaginated minute where they talk about paving .93 miles of seven roads, which includes Satilla and Holmes, I believe. In Sumter County v. Morris, which is that December 2023 case, the evidence in that case showed that the county had actually maintained the road in some respect between 2010 and 2019, that they had graded it and paved it, they had undertaken paving patches, yet the trial court still found that that wasn't sufficient to accept the offer of dedication. Now, it went up to the Court of Appeals and the Georgia Supreme Court on different grounds, but that was the trial court finding. My position still is that the county did not exercise sufficient dominion and control over these risks. Thank you. Thank you. Mr. Balbo. Judge Grant, you asked a question about whether or not this was happenstance, and I would like to give you a more fulsome response to that inquiry. The where and why this offense took place is critically important. As the government even conceded, if this offense had taken place in 1958, they would not have had a case. Similarly, the but-for causation language of the use of the public facility is incredibly important. If we sit here and say this altercation would have taken place just the same as if it had taken place in the yard of the house that was under construction, then Mr. Arbery's presence on that street is not the determinative factor of what happened. That's not true, though. There can be, the Supreme Court and this Court have been clear that there can be more than one but-for cause for a single incident. Why would that be any different in this context? Because, Your Honor, it is simply not the straw that broke the camel's back. In the absence of Mr. Arbery's presence on the street, if the same course of events would have unfolded, then simply being on that street was not the determinative factor. That's how they saw him. Yes, Your Honor. I see my time has expired. Yes, Your Honor. So how is that not the determinative factor if that is, in fact, how they saw him? If he'd been running through some neighbor's street, the likelihood that they would have seen him is very small. Yes, Your Honor. Because his presence on the street, as the case in Feltman talked about, it was a nonessential role in what happened. He happened to be on the street, but his presence on the street was not the determinative factor. If it could be easily removed and we could say the same result would have occurred, then it simply is not the straw that broke the camel's back. Thank you. Thank you. Mr. Theodosia. In Gooch v. United States, the Supreme Court specifically said, indicated that Congress added that or otherwise to the kidnapping statute precisely to cover situations where, quote, the captor might secure some benefit to himself, close quote. Not some benefit, end of statement, not some benefit to himself or another, not some benefit to himself or society, but some benefit to himself. And in this case, there is no specific evidence that that was anyone's motivation. As indicated by the government, there was some of the ugliest, most repulsive evidence any of us have ever heard in the trial in this case. And in these particular cases, courts have to be particularly cognizant of the fact that when a jury hears that type of evidence, we have to make sure that the government is actually providing some evidence as to all of the essential elements of crimes because it is such an uphill battle. Whenever you come, well, I see my time is up. Thank you. Thank you. Thank you all. We have your case under advisement. Yes. Thank you. Thank you. The second case, and I know y'all are setting up, I'll give you a